24CA1608 Peo v Valanzuela 08-13-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1608
Jefferson County District Court No. 15CR579
Honorable Russell Klein, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Timmy Dino Valanzuela,

Defendant-Appellant.

---

ORDER AFFIRMED

Division VI
Opinion by JUDGE BERGER*
Grove and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 13, 2026

---

Philip J. Weiser, Attorney General, Trina K. Kissel, Senior Assistant Attorney General and Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee

Joshua Martin, Alternate Defense Counsel, Grand Junction, Colorado, for Defendant-Appellant


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1    Defendant, Timmy Dino Valanzuela, appeals the postconviction court's order denying his Crim. P. 35(c) motion for postconviction relief.  We affirm.

## I.    Background

¶ 2    On February 23, 2014, Valanzuela and his two brothers, who were members of the Gallant Knights Insane (GKI) gang, were at a bar and became involved in an incident with the victim.  Valanzuela shot the victim multiple times, but the victim survived his injuries.  Valanzuela was arrested a short time later.  While awaiting trial in the county jail, he asked a fellow inmate to have the victim killed.

¶ 3    A grand jury indicted Valanzuela on one count each of violation of the Colorado Organized Crime Control Act (COCCA), attempted first degree murder, conspiracy to commit first degree murder, and solicitation to commit first degree murder, and two counts of possession of a weapon by a previous offender.  Valanzuela's brothers were also indicted on charges stemming from the February 23 incident.  With regard to the COCCA count, the prosecution alleged that GKI was a criminal enterprise and that Valanzuela engaged in the underlying criminal acts on behalf of the

enterprise. The prosecution later added five habitual criminal counts.

¶ 4    At a joint trial, the prosecution presented evidence relevant to the COCCA count that showed that (1) Valanzuela and his brothers were the leaders of GKI; (2) the gang's code of conduct forbade snitching and authorized members to kill any person who was put on a "hit list" for snitching; and (3) Valanzuela and his brothers targeted the victim because he was a former member of a now defunct gang and had been labeled as a snitch.

¶ 5    A jury found Valanzuela guilty of the charges, and the district court adjudicated him a habitual criminal. The court sentenced Valanzuela to an aggregate term of ninety-six years in the custody of the Department of Corrections.

¶ 6    A division of this court affirmed the judgment of conviction. *See People v. Valanzuela*, (Colo. App. No. 16CA0106, Mar. 5, 2020) (not published pursuant to C.A.R. 35(e)).

¶ 7    In 2021, Valanzuela filed a timely Crim. P. 35(c) motion, which was later supplemented by appointed counsel. **(CF, pp. 1668-78, 1725-38)** Among other things, he alleged that Larry Cordova — a former GKI member who testified at trial for the prosecution

2

regarding the inner workings of the gang — had recently recanted his testimony. Valanzuela asserted that, had Cordova testified truthfully at trial, the prosecution would have been unable to prove that Valanzeula's offenses were related to his gang involvement — an element of the COCCA charge.

¶ 8    The postconviction court summarily denied most of Valanzuela's claims and denied the recantation claim after an evidentiary hearing.

## II.    Legal Authority and Standard of Review

¶ 9    As relevant here, a defendant can collaterally attack their conviction on the ground

> [t]hat there exists evidence of material facts, not theretofore presented and heard, which, by the exercise of reasonable diligence, could not have been known to or learned by the defendant or his attorney prior to the submission of the issues to the court or jury, and which requires vacation of the conviction or sentence in the interest of justice.

Crim. P. 35(c)(2)(V); *see* § 18-1-410(1)(e), C.R.S. 2025.

¶ 10    "[A] defendant can be entitled to a new trial as the result of newly discovered evidence only if that evidence would be likely to result in acquittal for reasons beyond simply impeaching the earlier

3

conviction." *Farrar v. People*, 208 P.3d 702, 707 (Colo. 2009). The recantation of a witness who testified at trial can constitute newly discovered evidence. *Id.* "[R]ecantation can justify a new trial only if it contains sufficiently significant new evidence, and if it, rather than the witness's inconsistent trial testimony, will probably be believed." *Id.* at 708.

¶ 11　The district court is tasked with measuring the credibility of the recanting witness and determining whether that witness's new version would probably be believed. *Id.* Specifically, the court must determine "whether a reasonable person with the appropriate degree of skepticism and awareness of the relevant circumstances, rather than a typical juror, would probably believe the witness's new version of events." *Id.*

¶ 12　We review a postconviction court's factual findings for clear error and its legal conclusions de novo. *Martinez v. People*, 2024 CO 6M, ¶ 24; *People v. Smith*, 2024 CO 3, ¶ 16. Under the clear error standard, we must affirm the court's findings unless they are without record support. *Martinez*, ¶ 34.

¶ 13　The court "determines the weight and credibility to be given to the testimony of witnesses in a Crim. P. 35(c) hearing." *People v.*

*Washington*, 2014 COA 41, ¶ 17. We defer to a court's credibility findings if there is record support for them. *See People v. Wheeler*, 2020 CO 65, ¶ 8; *People v. Kyler*, 991 P.2d 810, 819 (Colo. 1999).

III.  The Court Did Not Err By Denying the Recantation Claim

¶ 14  We conclude that the postconviction court did not err by finding that Valanzuela failed to establish that he was entitled to a new trial based on the recantation of a witness.

A.  Postconviction Evidentiary Hearing

¶ 15  At the postconviction evidentiary hearing, Cordova testified that he had contacted Valanzuela's family because he had a "guilty conscience about certain stuff" and "felt like maybe [he] did the wrong thing" by "[j]ust being involved overall in general." Cordova initially denied that parts of his trial testimony were untrue, before "refram[ing]" his answer:

> I mean, everything that I spoke about was, I mean, to the best of my knowledge, but, you know, like other people can say whatever they want, you know what I mean, and I feel like I kind of got led into something that I shouldn't have been involved in.

¶ 16  Cordova also said that, contrary to his trial testimony, he was not personally aware of the structure and hierarchy of GKI and that

5

his testimony was based on "things that [he] ha[d] heard from other members" and from law enforcement. Specifically, he said that there was no hierarchy in GKI and no person who could order a hit on another individual. Cordova further testified that when he testified at Valanzuela's trial he had received benefits from law enforcement beyond those that were revealed to the jury.

¶ 17 On cross-examination, Cordova walked back or otherwise undermined much of his testimony on direct. For example, he agreed that "there's nothing [he] said at trial that was untrue . . . to [his] knowledge" and went on to state that he could not "say if it's [a] hundred percent true or not." He agreed that his postconviction testimony was "clarifying [that] . . . some of the information [he] testified to . . . [was] received from other folks."

¶ 18 Cordova acknowledged seeing a GKI "hit list." He also admitted that the jury was told about all of the benefits he had received as of the trial and that additional benefits were obtained after trial and were promised to him for being an informant.

¶ 19 Cordova acknowledged his lengthy criminal history. And he admitted that he contacted Valanzuela's family about recanting his trial testimony after he had been charged in a separate matter with

first degree assault and was facing a lengthy prison term with a "snitch jacket."

¶ 20 During redirect examination, Cordova reiterated that he was testifying at the postconviction hearing because of "the possibility of possibly giving untruthful testimony" at trial. When asked if his trial testimony was untruthful or was not actually based on his personal knowledge, Cordova provided a qualified response of "[t]o an extent."

¶ 21 Cordova also said, "[y]es," when asked whether there were individuals who exclusively ran GKI and whether those individuals were referred to by a hierarchical gang rank. But, when defense counsel suggested that the question that Cordova had just answered was unclear, Cordova changed his testimony to say that there was no hierarchy or leadership structure in GKI and that there were no leaders.

¶ 22 In its order denying the recantation claim, the postconviction court found that Cordova did not change his trial testimony and that, "[i]nstead of a true recantation, [Cordova provided] a series of statements that were difficult to categorize[,] . . . follow[,] or reconcile." The court described Cordova's postconviction testimony

as "muddled," "fuzzy," "uncertain," "qualified," "contradictory," and "internally inconsistent." The court also noted that Cordova provided one answer to an open-ended, non-leading question but that, upon being redirected with a leading question from defense counsel, Cordova "corrected his testimony."

¶ 23    The postconviction court found that Cordova's testimony merely indicated that he did not have personal knowledge of the things he testified to at trial and that his trial testimony was true to the best of his knowledge. The court extensively cited to parts of Cordova's postconviction testimony to support this characterization. The court ultimately determined that Cordova's postconviction testimony was not credible and that, to the extent it could be considered a recantation, a reasonable person would not believe this new testimony over his trial testimony.

### B.    Analysis

¶ 24    We conclude that the record supports the postconviction court's ultimate findings.

¶ 25    First, while Cordova's postconviction testimony differed in certain respects from his trial testimony, the record provides sufficient support for the postconviction court's findings that

Cordova did not recant the portions of his trial testimony that were pertinent to the COCCA count; instead, he merely questioned the reliability of that testimony. *See Farrar*, 208 P.3d at 706-07 ("[N]ewly discovered evidence must be of sufficient consequence for reasons other than its ability to impeach, or cast doubt upon, the evidence already presented at trial.").

¶ 26 We also conclude that the record supports the court's alternative finding that, even if there was a recantation, a reasonable person would not believe Cordova's postconviction testimony over his trial testimony.

¶ 27 At trial, Cordova testified that he had been a member of GKI for over twenty years, and he described the GKI hierarchy and how he had moved up the ranks. When specifically asked how a GKI member elevates to "noble" status, Cordova said, "this is just from my personal knowledge, okay, and I'm going to give you the scenario that actually happened." Cordova also described times when he was given directives from higher ranking members to conduct "missions."

¶ 28 Cordova further testified at trial that he had seen the GKI hit list and recalled that, "just last year" while serving as the GKI

member in charge of a prison yard, he had been given the list to see if anyone in the yard was on it. On this issue, Cordova provided "a personal account with [him] and Mr. Timothy Valanzuela" about "an actual event that occurred."

¶ 29 Cordova conceded, similar to his postconviction testimony, that some of his information came from other GKI members or was based on rumors and general knowledge within GKI.

¶ 30 Importantly, the above trial testimony from Cordova regarding the inner workings of GKI was consistent with the testimonies of other former members of GKI, who offered similar descriptions at Valanzuela's trial. In fact, in his pretrial "Motion Objecting to Multiple Gang Experts," Valanzuela argued that Cordova and three other witnesses "have substantially similar testimony regarding the structure, hierarchy, code of conduct, coded language and general customs" of GKI, and that Cordova's testimony would be cumulative of the testimonies of other, more pertinent witnesses.

¶ 31 The record supports the court's credibility finding regarding Cordova's purportedly recanting postconviction testimony. *See Farrar*, 208 P.3d at 708 ("After considering all of the circumstances impinging on the recanting witness's credibility, including the

10

existence of her prior inconsistent testimony, the court must determine whether it is more likely than not that reasonable jurors would believe her more recent testimony.").

¶ 32     For these reasons, the record supports the court's finding that a reasonable person with the appropriate degree of skepticism and awareness of the relevant circumstances would probably not believe Cordova's new testimony.  *Id.*

## IV.    Disposition

¶ 33     The order is affirmed.

JUDGE GROVE and JUDGE MOULTRIE concur.